IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DON TRIPP**

    Plaintiff,

v.                                                                          No. CIV 01-0177 BB/WWD

**CITY OF SOCORRO, OFFICER BOBBY ARAGON,
CAPTAIN ED BRITT and CHIEF JOHNNIE TRUJILLO**

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' motion for summary judgment (Doc. 17). This Court has reviewed the parties' submissions and the relevant authorities and finds that Defendants' motion should be GRANTED in part and DENIED in part.

Plaintiff, a resident of Socorro, New Mexico, brings this action pursuant to the Fourth and Fourteenth Amendments, under 42 U.S.C. §§ 1983 and 1988, and under New Mexico law. Plaintiff claims Defendants, Officer Bobby Aragon, Captain Ed Britt, Chief Johnnie Trujillo, and the City of Socorro (Defendants), violated his civil rights when Officer Aragon shot Plaintiff in the hand during an incident at Plaintiff's residence. Plaintiff also asserts his rights were violated by Defendants' malicious prosecution, when he was arrested and tried for assault. The facts below are derived from pleadings, depositions, trial transcripts from Plaintiff's criminal trial, and affidavits submitted by the parties. Where there is a dispute concerning the facts, they are stated in the light most favorable to Plaintiff, as is required under a summary-judgment analysis.

On the evening of February 13, 1999, Plaintiff's grandmother called 911. She reported that her grandson, who lived next door but was at her house, was enraged over a dispute regarding the family business. The grandmother asked the police to intervene. She said that Plaintiff was very angry with his father and she was worried he might hurt someone. Plaintiff, listening to the same 911 conversation, said he would shoot the police if they came to the house. The Socorro police dispatcher, who heard Plaintiff's threat, asked the grandmother if Plaintiff had a gun, to which she replied that he did. Plaintiff admits he threatened to shoot the police, but maintains it was not a serious threat and the police officers, who had all known him for years, should have known that.

The grandmother called back some time later and asked the police not to come, out of her concern over Plaintiff's threat toward the police. Considering the grandmother's initial request and Plaintiff's threat, Defendant Britt believed it would be imprudent not to investigate the situation. Upon arrival at the scene, Defendant Britt first spoke to the grandmother, who reported that Plaintiff had returned to his own house. Britt attempted to contact Plaintiff by telephone with the grandmother's assistance. Plaintiff slammed the receiver down when Britt began to identify himself. Plaintiff refused to answer subsequent calls from the police.

Defendants next tried to contact him directly at his home, but observing the police approaching, Plaintiff again refused to talk. Plaintiff's girlfriend then came outside and spoke with Britt. She reported that Plaintiff was very angry and had a gun, and she was worried about his young daughter inside the house. The girlfriend told police she had asked to take the girl to the grandmother's house, but Plaintiff had refused to let her do so. She also stated, however, that Plaintiff was not angry at her and she was not afraid for her own safety. The girlfriend returned to the house with police requests to talk to Plaintiff, and to let his daughter leave the house.

2

Plaintiff refused both requests and further stated he would not allow his daughter to leave the house unless his father was brought to the scene. Britt believed a "potential hostage situation" existed at that point, although he characterized it as a "borderline" hostage situation rather than a full-blown one. Britt also believed it best to continue negotiating with Plaintiff discreetly, instead of using a loud broadcast system. Neither Britt nor any other police officer ever ordered Plaintiff out of the house, or ordered him to let his daughter leave the residence. At some point, Britt sent Defendant Aragon around the back of the house, to watch the back yard, notify Britt if anyone left the residence, and attempt to see into the house through two windows. Britt testified that this was an effort to secure the area and prevent "anyone" (presumably meaning Plaintiff) from approaching the officers undetected. Britt informed Aragon about Plaintiff's threat to shoot police officers.

In an attempt to observe any activity inside the house, Officer Aragon entered Plaintiff's backyard by hopping over a wall. Aragon made his way around the house, decided he was too close to the house, and began to retreat the way he had come. As he began to turn around, or just before he turned around, Aragon heard a man say "Hey."[1] Aragon then saw a man rounding a blind corner with a gun in his hands, at a distance of six to ten feet. The first thing he saw was the gun, allegedly pointed at him. Plaintiff does not deny that he held a gun in his hand, but does deny that he pointed it at anyone. Aragon testified that he pointed his flashlight at the person, lighting up the gun and Plaintiff's whole torso. Plaintiff, however, testified that he saw no flashlight beam; at this point of the proceedings, therefore, the Court must assume Aragon did not turn on his flashlight or point it at Plaintiff.

---

[1] Aragon may have told Britt that he did not make out what the man said. Whether Aragon heard Plaintiff say "Hey" or something unintelligible is immaterial.

3

There is no dispute that Aragon did see the gun; however, there is a dispute over whether it was light enough for Aragon to identify the carrier of the gun. Aragon testified that he could tell the person was not a police officer, and that it was Plaintiff. Plaintiff, however, testified it was too dark for him to identify Aragon, or to see him clearly in the dark. The Court therefore again must assume Aragon could not identify Plaintiff as the man holding the gun. Aragon claims the gun was pointed at him, that he was sure he was about to be shot, that his own life was in danger, and that he had no alternative but to shoot Plaintiff. Aragon uttered an expletive, whispering "Oh, shit!" according to Plaintiff. Aragon then fired two rounds, one of which struck the gun and then ricocheted into Plaintiff's hand. The other round apparently missed Plaintiff altogether. Aragon was not specifically aiming at Plaintiff's gun, as he testified he fired at "center mass"; fortunately for Plaintiff, the injuries he suffered were not life-threatening.

Plaintiff asserts he did not believe any police officers were still near his house. He contends he merely left his house to retrieve some firewood while carrying the gun in a shoulder holster. As he approached the corner of the house, he heard leaves crunching and suspected a prowler had entered his yard. Plaintiff said he then withdrew his gun from the holster and proceeded to investigate the source of the noise, and that he was shot shortly after he saw an unidentified figure in a crouching position and heard the expletive. Plaintiff contends Aragon had enough time to identify himself and give Plaintiff instructions to drop his weapon, before firing at him.

A State Police investigator testified that, judging from the bullet trajectory, Plaintiff's gun was most likely pointed in at least the general direction of Defendant Aragon.

After the shooting incident, Plaintiff was arrested and charged with assaulting a peace officer with a deadly weapon. Following a jury trial, Plaintiff was acquitted of any and all charges

resulting from the incident. He then filed this lawsuit, asserting claims for excessive force, state-law battery, and constitutional and state-law malicious prosecution.[2] Defendants have moved for summary judgment on all claims.

**Standard of Review for Summary Judgment**

Consideration of a summary judgment motion entails a finding of whether a genuine issue of material fact exists. If not, the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party has the initial burden of showing the absence of a genuine issue. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). An allegation of a factual dispute that is otherwise unsupported will not defeat a motion for summary judgment that is well presented. *FDIC v. Hulsey*, 22 F.3d 1472, 1481 (10th Cir. 1995).

**Qualified Immunity: Excessive-Force Claim**

Defendants have asserted the defense of qualified immunity. This affirmative defense protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The defense is designed to protect officials not only from standing trial, but also to avoid the burdens of pretrial matters such as discovery. *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001). Once a defendant asserts this defense, the burden shifts to the plaintiff. *Id.,* 252 F.3d at 1128. The plaintiff must satisfy a "heavy two-part burden": first, the plaintiff must establish that the defendant's actions violated a constitutional or statutory

---

[2]Defendants maintain the complaint does not state a cause of action for malicious prosecution. As discussed below, however, paragraphs 19 through 21 of the complaint are sufficient to state such a claim.

right; if that is accomplished, the plaintiff must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. *Id.*[3]

In excessive-force cases such as this one, of course, the constitutional right involved is the Fourth Amendment protection against use of excessive force in the seizure of Plaintiff's person. *Tennessee v. Garner*, 471 U.S. 7, 8 (1985). In *Medina*, the Tenth Circuit reviewed the traditional standards applicable to a police-shooting case such as this one: the objective reasonableness of the officer's conduct must be assessed from the perspective of a reasonable officer on the scene, recognizing that officers may be forced to make split-second judgments under stressful and dangerous conditions. 252 F.3d at 1131. Factors relevant to the reasonableness inquiry include the severity of the crime, the potential threat posed by the suspect to the officer's safety and others' safety, and the suspect's attempts to resist or evade arrest. *Id.* As a police-shooting case, the *Medina* opinion is extremely helpful in assessing the reasonableness of the police actions taken in this case; a brief discussion of the facts and holding of *Medina* is therefore warranted.

In *Medina*, the incident began when the plaintiff told a bail bondsman, who had come to the plaintiff's residence to take him into custody, that he had a gun. The bondsman retreated and called police, who came to the scene. After a standoff during which the plaintiff exhibited volatile behavior and told the police he had a gun, he exited his home carrying a staple gun concealed

---

[3]In excessive-force cases, the Tenth Circuit formerly recognized that the reasonableness inquiry in such cases overlaps with the qualified immunity question, because both require the application of a reasonableness standard to judge the officer's behavior. *Id.* at 1131. This recognition is no longer valid, following the Supreme Court's decision in *Saucier v. Katz*, ___ U.S. ___, 121 S.Ct. 2151 (2001), decided a few days after *Medina*. In *Saucier*, the Supreme Court held that the qualified immunity inquiry in an excessive-force case has "a further dimension," involving inquiry into whether the officer had a reasonable, but mistaken, belief that the amount of force he used was acceptable under the law. It is not clear how this "further dimension" differs from the question of whether an officer's use of force was reasonable under the totality of the circumstances, the standard applied in *Medina*. In this case, however, application of the *Saucier* "further dimension" is unnecessary.

under a towel. Officers ordered the plaintiff to stop, but he kept walking into the street. One officer followed the plaintiff, and an attack dog was released. The dog bit the plaintiff but then retreated, and was released a second time. At that point the plaintiff dropped to the ground and turned to the left, exposing the staple gun. The officers thought the staple gun was a pistol and the officer following plaintiff believed he and other officers were in the line of fire. That officer and another officer immediately fired at the plaintiff, hitting him in the stomach. The Tenth Circuit determined that the officers' response in attempting to stop the plaintiff was reasonable under the circumstances, and that the plaintiff had therefore failed to establish a violation of his Fourth Amendment rights. 252 F.3d at 1132.

It is difficult to distinguish this case from *Medina*. In this case, as described above, Plaintiff had acted in a sufficiently belligerent manner as to cause his grandmother to call for assistance. Plaintiff then threatened to shoot any police officers who came to the scene. He refused to communicate with the officers and refused to allow his daughter to leave the home. Furthermore, his girlfriend reported that he was still angry and had a gun. Faced with this situation, Captain Britt decided to secure the area and post an officer, Aragon, in the rear of the house to monitor activity there and, if possible, to look into the windows and observe what was happening inside. Aragon knew Plaintiff had threatened to shoot the police. He entered the backyard to try to look into the windows, decided he was too close to the house, and began to retreat. At that time he saw a man holding a gun, rounding a corner, beginning to walk toward him and pointing the gun in his general direction. He heard the man say, "Hey." Aragon was certain he was about to be shot, uttered an expletive, and fired two shots at the man. As in

7

*Medina*, Aragon saw a weapon pointed in his direction[4] and believed the weapon was about to be fired. His reaction, to fire his weapon first, is indistinguishable from the officers' reactions in *Medina*, and the Court therefore holds the Fourth Amendment was not violated by the shooting.

In an attempt to avoid the above result, Plaintiff raises several arguments. First, he maintains Captain Britt and Officer Aragon recklessly created the situation that culminated in the shooting, and that this should be considered in the analysis. Plaintiff is correct in arguing that an officer's conduct immediately prior to the actual shooting is relevant to the question of whether a constitutional violation occurred. *Id.*, 252 F.3d at 1132. If officers act recklessly and thereby unreasonably create the need to use force, they may be found to have used excessive force even if they were in danger at the time of the shooting. *Id.* However, it is important to emphasize that the conduct creating the need to use force must rise to the level of recklessness, rather than negligence. *Id.* Plaintiff contends he had committed no crime at the time of the incident, there was no need for the officers to be at his home, the officers knew him and knew he was not dangerous, and there was certainly no need for Officer Aragon to be in his backyard. He maintains that the officers' conduct was therefore reckless, and that they recklessly created the situation that caused Aragon to shoot him.[5] This contention ignores the following undisputed

---

[4]It should be noted that in this case, Aragon was certain he saw a gun, and Plaintiff was in fact holding a gun in his hands; in *Medina*, there was no gun but the officers merely believed the plaintiff was holding a gun.

[5]Plaintiff supports his argument with an affidavit submitted by an expert, Maurice Moya. The Court does not find this affidavit helpful, and has disregarded it, for two reasons. First, the expert omitted crucial undisputed facts in arriving at his conclusion that the officers acted recklessly. For example, the expert omitted the fact that Plaintiff threatened to shoot the police if they came to the scene. He also omitted the fact that Plaintiff refused to allow his daughter to leave the house. Finally, and perhaps most crucially, he omitted the fact that the gun Plaintiff was holding was pointed at least in the general direction of Officer Aragon when he fired, and perhaps directly at him. Where an expert's affidavit omits crucial facts or is based on an obviously incomplete review of the record, it is not sufficient to withstand a motion for summary judgment.

8

facts: Defendants knew Plaintiff was very angry, had a gun in his possession, had threatened to shoot police officers, refused to discuss the situation with the officers, and refused to allow his daughter to leave the house. Given that information, Defendants had no way of knowing whether Plaintiff posed a threat to members of his family or to anyone else. Defendants would therefore have been derelict in their duties if they had failed to investigate the situation further, by attempting to communicate with Plaintiff and by remaining on the scene. In addition, it cannot be said that it was reckless for Captain Britt to secure the area by posting Officer Aragon at the rear of the house, to monitor the back yard and, if possible, to look into the house through the windows to keep an eye on Plaintiff or his daughter.

The only action prior to the shooting that might possibly rise to the level of negligence, as opposed to recklessness, was Aragon's decision to enter the back yard instead of remaining behind the wall. Even this action, however, was at most negligent. Aragon did not intend to confront Plaintiff, who was thought to be inside the house, but rather intended to obtain a better view through the windows. In *Medina*, it was not reckless for the officer to follow the suspect closely in an attempt to tackle him from behind; similarly, in this case, it was not reckless for Aragon to enter Plaintiff's yard to try to observe Plaintiff's behavior without Plaintiff in turn being able to see Aragon. In sum, in a situation involving a possibly volatile individual armed with a gun, a police officer's decision to try to monitor that individual's behavior is not reckless, even if it requires entry onto the curtilage of the individual's home. *See, e.g., United States v. Anderson*,

---

*See Williams v. Ford Motor Co.*, 187 F.3d 533, 544 (6th Cir. 1999). In addition, the expert's affidavit in this case contains conclusory statements concerning recklessness that are more akin to legal conclusions than to factual opinions. Again, an affidavit containing such statements is insufficient to raise a question of fact at the summary-judgment stage. *See, e.g., Kitto v. Farmers Ins. Co., Inc.*, 1994 WL 637013 (10th Cir.) (conclusory assertions in expert's affidavit, without supporting facts and contradicted by evidence in the record, cannot defeat motion for summary judgment).

9

981 F.2d 1560, 1567 (10th Cir.1992) (Law enforcement officers may enter private premises without a warrant when exigent circumstances are present; exigent circumstances arise when (1) officers have reasonable grounds to believe there is an immediate need to protect the lives or property of others, (2) search is not motivated by an intent to seize evidence, and (3) there is some reasonable basis, approaching probable cause, to believe an emergency situation exists). All of the facts and arguments to which Plaintiff directs the Court's attention establish at most negligence on the part of Defendants, if that. Therefore, the actions leading up to the shooting cannot be the basis of an excessive-force claim. *See Medina*.

Plaintiff also contends there are questions of fact as to whether Aragon's decision to shoot was reckless. Plaintiff argues that Aragon had time to identify himself and command Plaintiff to drop his gun, before firing. Plaintiff also argues there is a question of fact as to whether Aragon could identify Plaintiff as the person holding the gun, prior to the shooting. The Court recognizes there are questions of fact as to these issues. However, they do not raise an issue of fact concerning the recklessness inquiry. It is undisputed that Aragon saw a man with a gun, six to ten feet from him, and that the gun was pointed in his general direction. It is also undisputed that Aragon knew Plaintiff had threatened to shoot police officers. Finally, it is undisputed that Aragon thought he was going to be shot, and fired his own gun to prevent that from happening. Given these undisputed facts, the Court cannot conclude that Aragon was reckless in deciding to shoot at Plaintiff rather than taking the time to identify himself. Furthermore, it was not reckless for Plaintiff to conclude that the person holding the gun was Plaintiff, even if he could not see Plaintiff clearly; he was in Plaintiff's back yard, and to his knowledge he was the only police officer stationed behind the house. In sum, Aragon was faced with a split-second decision as to

whether he was in danger of being shot, and concluded that he was. Under the circumstances, his response was not reckless.

**Municipal and Co-Defendant Liability**

The parties have stipulated that should Defendant Aragon not be found liable for a constitutional violation, Plaintiff's claims for failure to train, failure to supervise, and for municipal liability concerning the excessive-force claim should also be dismissed. Therefore, these claims will be dismissed as to the City of Socorro, Captain Britt, and Chief Trujillo.

**State-Law Battery Claim**

Defendants devoted one paragraph in their brief to this claim, arguing that if no excessive force was used as a constitutional matter, the common-law battery claim must also fail. Plaintiff did not respond to Defendants' argument. The Court will therefore accept that argument, and hold that the state-law battery claim will be dismissed.[6]

**Malicious Prosecution Claims**

Defendants' brief in support of the motion for summary judgment contains only one sentence addressing possible claims for false arrest or malicious prosecution, and states that such claims cannot be maintained because a neutral magistrate found there was probable cause to proceed with criminal charges against Plaintiff. In the response brief, Plaintiff says essentially two things: first, his acquittal of the criminal charge is an element of a malicious-prosecution or malicious-abuse-of-process claim, and his claim may therefore proceed; second, he needs to

---

[6]The Court notes it might be possible to construct an argument that battery by a law enforcement officer, under New Mexico's tort claims statute, is not the equivalent of an unconstitutional use of excessive force. For example, negligence that causes a need to use force, while not enough to state a constitutional claim, might be sufficient in the state-law context. Such an argument, however, would raise complex issues of state law, and the Court will not attempt to make, much less resolve, the argument for Plaintiff.

perform discovery to be able to resist the summary-judgment motion as it concerns these claims.[7] Finally, in the reply brief, Defendants maintain that the complaint does not state a claim for malicious prosecution, and even if it does such a claim must fail on the merits.

The Court disagrees with the assertion that the complaint fails to state a claim for malicious prosecution or malicious abuse of process. Paragraphs 19 through 22 of the complaint, while not crystal-clear, allege generally that the sole purpose of the arrest and prosecution of Plaintiff for assault on a police officer with a deadly weapon was to cover up the fact that Defendants were at fault in the shooting. These paragraphs also allege that Plaintiff was incarcerated as a result of the arrest and prosecution. The allegations appear to be sufficient to state a constitutional claim for malicious prosecution as well as a state-law claim for malicious abuse of process. *See Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996) (constitutional malicious-prosecution claim takes state law as starting point, but requires additional element – Fourth Amendment deprivation such as illegal seizure or detention); *Devaney v. Thriftway Marketing Corp.*, 953 P.2d 277 (N.M. 1997) (establishing new tort that encompasses tort of malicious prosecution, and calling it malicious abuse of process).[8]

Since these claims do not fail as a matter of law, the Court must address Defendants' alternative argument that they fail as a matter of fact. At this time, however, the Court is hesitant

---

[7]Plaintiff's counsel filed a Rule 56(f) affidavit, as he is required to do, setting out his request for discovery.

[8]The Court notes Defendants' argument that, as a matter of law, the intervention of a neutral magistrate in the charging process absolves Defendants of any possible malicious-prosecution liability. This is not a valid argument, at least as a matter of law. *See, e.g., Darrah v. City of Oak Park*, 255 F.3d 301, 310-11 (6th Cir. 2001) (if officers knowingly supply false information to entity making probable-cause determination, that entity's determination does not preclude malicious-prosecution claim). It is true, however, that under the right circumstances the neutral magistrate's decision could constitute collateral estoppel preventing the issue of probable cause from being re-litigated. *Id.*

to rule on the merits of the malicious-prosecution or malicious-abuse-of-process claim. Defendants did not brief the merits of these claims until they filed their reply brief. Generally, in the interest of fairness, it is not appropriate to address matters raised for the first time in a reply brief. *See Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 724 (10th Cir.1993).

On the other hand, the Court is also reluctant to simply grant Plaintiff's request for discovery concerning these claims. Plaintiff admits that he stipulated to the stay of discovery that has been entered in this case, and it is not clear why he should then be able to turn around and argue he needs to perform discovery in order to meet his burden at the summary-judgment stage. Furthermore, the facts surrounding the shooting and subsequent prosecution of Plaintiff have already been the subject of a full-blown criminal trial, and it is not clear what additional information Plaintiff believes he can obtain with more discovery in this case. Finally, it is important to point out that one of the purposes of qualified immunity is, where appropriate, to relieve officers of the obligations not just of facing trial, but of undergoing extensive pretrial discovery. *See Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir.1992). Therefore, the Court will schedule a hearing to address these issues before any discovery request is granted. At that hearing, the parties should be prepared to discuss specifically what discovery Plaintiff believes is necessary, what facts he expects to uncover during that discovery, and how those facts would satisfy the elements of the malicious-prosecution or malicious-abuse-of-process claims, especially given the independent magistrate's probable-cause determination that preceded the criminal prosecution.

**Conclusion**

Based on the foregoing, summary judgment will be granted on the excessive-force and battery claims, as to all Defendants. Summary judgment will be denied, at this time, on the malicious-prosecution and malicious-abuse-of-process claims.

**ORDER**

A memorandum opinion having been entered this date, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' motion for summary judgment (Doc. 17) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 17th day of December, 2001.

BRUCE D. BLACK
United States District Judge

**Attorneys:**
For Plaintiff
James C. Ellis

For Defendants
Virginia Anderman
Andrew M. Sanchez